on the calendar, Frost v. NYPD. Good morning, Your Honors. May it please the Court. My name is Jonathan Edelstein. I represent the plaintiff appellant, Garrett Frost. The district court decision in this case is an extension of Jeffrey's, that if it's allowed to stand, will change the nature of summary judgment. It took a doctrine intended to apply only in extreme cases and applied it to garden-variety credibility issues, and then it also extended that doctrine by applying it to a non-party fact witness. Now, our position on this appeal is twofold. First of all, this Court implied in footnote 4 of the FOSAMAX products case that Jeffrey's does not apply to non-party fact witnesses as opposed to expert witnesses. And we submit that the Court should make what was implicit in FOSAMAX products explicit, that if Jeffrey's can be applied to non-party fact witnesses, then summary judgment basically will turn into a bench trial before the jury trial, where the deb to create sham disputes of fact. Sotomayor, in FOSAMAX products, we have an expert that contradicted his own deposition and that contradicted his own prior report. And a report, an expert report, is presumably made after the expert has done a thorough examination of the facts and reviewed them according to his expertise, his or her And, therefore, an expert report is a considered formal statement. And then when an expert just makes an affidavit that completely contradicts that, that it's a sham in a way that a prior inconsistent statement by a fact witness outside the context of this lawsuit is not. Roberts, we would have said, Mr. Dunlap, that Jeffries could never apply to a third-party fact witness. You could have a situation where someone saying something so fanciful that it would be crazy to say that this would be possible. So I understand your argument. And, in fact, obviously, this doesn't fall into that category. But to say that Jeffries could never possibly apply to a third-party fact witness, I think, would then require a court not to say that this is so fanciful, it can't be a basis for creating an issue of fact, right? In that extreme case, not in where there's just some inconsistency, but in that extreme case where it's so fanciful, no one could credit it. I mean, I did suggest in the reply brief if the fact witness makes a statement that's physically impossible. Faster-than-light trip to Betelgeuse, I believe, was the example I used. And I think that a court could be justified in discrediting that. But here, where the Court's disagreement with the Vega affidavit was basically that the affidavit did not comport with the way the Court believed that the world worked, that's not something extreme enough to invoke Jeffries. So that's really the second part of our argument, is that even if Jeffries does apply to third-party fact witnesses, it should not apply here. Roberts. Can I move you on to the question of whether there were genuine disputes of fact, material fact, regarding the existence of probable cause at the time of the shooting? Is there any dispute that Frost was standing at the stairwell from which Chapman was shot, that Frost had a motive to retaliate because he had been assaulted the night before, that McLaurin identified Frost as the shooter? No, he was there. There's no dispute about any of that. But McLaurin was the guy in the white shirt. He was the guy who Mr. Vega had originally identified as standing in the very doorway where the shots came from. The police had viewed surveillance video. They knew he was the guy in the white shirt. So this is a case where he's not a citizen informant. This is a case where Mr. McLaurin not only had extreme factors that cast doubt on his veracity, but where the police knew or should have known of the factors that cast doubt on his veracity. Even if McLaurin was minimizing his role by saying that your client was the shooter, at a minimum, your client had the motive, your client was present, and the shooting took place, even if he aid and abetted Mr. McLaurin, as opposed to being the shooter, there was probable cause to believe that he was involved in this incident if all those things were before the police, right? Sotomayor Well, what this Court held in the Dufourt case is that things such as presence and motive by themselves are, quote, too gossamer to establish probable cause, at least to eliminate issues of fact as to probable cause. Alito Presence, motive, and a witness, right? Sotomayor Well, you have a witness who is the — basically the shooter, and who the police know through surveillance video is the guy — is very likely to be the shooter. So I would submit, as in the Zari case, as in the Dufourt case, that the fact that an identification has been made does not in and of itself create probable cause where there are known to the police multiple factors that cast doubt on the veracity of the identifier. And — Roberts Can I just clarify one — a couple of things? Sotomayor Yes. Roberts Can I just clarify one — a couple of things? On your malicious prosecution and due process claims, are the only — am I correct that the only individual defendants are Spanichia and O'Neill? Sotomayor Correct, Your Honor, yes. Roberts Can And with respect to the excessive force claims, it's Captain Jemot, C.O. Joy, for the October 9th incidents, Hill, Ryan, Young, McLaughlin, Barksdale, Corker, and Sanchez for the January 16th incident, and McDuffie, Soria, Preble, and Souffrant, Cardi, and Trulli for the July 16th incident. Is that correct? Sotomayor You are correct, Your Honor. Roberts Okay. I want to ask you — Sotomayor And — oh. Roberts About the July 16th incident, I watched that video, and after your client is restrained, there is one officer who appears to, with his knee four times in his head, make a motion towards his head, and you hear the inmate saying, stop kicking him in the head, and the camera moves away. Sotomayor Yes. Roberts So my question to you is, of all those individuals who are charged — who are named in that particular excessive force claim, do you — have you identified who that particular officer is who was — who was near his head, and his knee was moving towards his head multiple times? Sotomayor Unfortunately, the plaintiff could not identify exactly which officer that was. But we are submitting, as argued in the briefs, that it was — it's an acting-in-concert situation, and it's also a situation where all the officers present, as was held in the I mean, your client, in that video, was clearly — they needed to restrain him.  Sotomayor So up to that point, he clearly needed to be restrained. At that point, he was restrained. The other officers would have had no idea that that particular officer was going to suddenly — it all happened in about, you know, seconds — start moving his knee towards his head four times. There was no time to intervene. There was — it was just gratuitous, but it was immediate. And I don't know how the jury could decide which officer did that. How could the jury figure out which of those — there was, like, six officers there. Sotomayor If the jury were to find that there's a municipal policy, which we also contend there's an issue of fact concerning, then it wouldn't matter which of them did it, because if there's a Monell claim, the officer that inflicted the blow does not have to be a named defendant. And I see I'm out of time, but if I can just return — The argument is made that he denies possessing the blade, right? Yes. But didn't he admit to promoting prison contraband in the — didn't he admit to possessing the blade and to promoting prison contraband in a second degree? And the Court adopted that position in accepting his plea. So how can he argue it now that he didn't possess the blade? Well, he — he did plead to promoting prison contraband. I don't recall whether in the record he explicitly admitted that the contraband was a blade as opposed to some other item. And, again, if I can just briefly return to the issue of probable cause, I just want to point out that in the due process claim, probable cause is not a defense. That so long as the plaintiff was arrested and incarcerated based on fabricated evidence, that due process claim will lie. And if the Vega affidavit is considered, then summary judgment on that claim was clearly in error, regardless of whether there was probable cause. Thank you. I'll reserve for rebuttal. Thank you. May it please the Court, Claiborne Henry, on behalf of the city. The facts created by an affidavit crafted solely to oppose summary judgment do not create genuine issues of fact. That's exactly what the panel tried to do with the Vega declaration. First, there was probable cause independent of the Vega declaration. Not only was Frost at the scene, in the stairwell where the bullets came from, it was the scene where he and a friend had been attacked the night before, McLaurin identified him as the shooter, and he fled the scene afterward. What Mr. Edelstein said is correct, though, under Bermudez, one of our cases, we said the absence of probable cause is not an element of a due process claim. So if there is a fabrication of evidence that is then used as part of the mix, there's a separate due process claim for the fabrication, whether or not the malicious prosecution claim is different, but wouldn't he, if in fact it was a fabrication of this statement, wouldn't he have a due process claim? If there was a tribal issue. Right. So if someone puts in an affidavit, that's not a sham affidavit situation. If the person was not deposed at the trial, he never, he refused to identify Mr. Frost at the trial. So there is no sworn statement either within this case in discovery or even in the he's testified differently, right? I mean, what are you relying on to say that this is a sham? He's saying that he was coerced. Sorry, Your Honor. What I would say is, number one, when he gave this statement to the police identifying Frost as the shooter, this wasn't just an offhand statement. He contacted the detectives because he wanted to provide information as to the Chapman murder, right? The only information that they didn't have was who the identity of the shooter was. They knew who the deceased was. They knew when and where it happened. They had the ballistics evidence. He reached out to them, and that's undisputed because he wanted to provide the he wanted to give them information to catch a break on a new arrest. The only information he was going to provide was the identity of the shooter. He makes no attempt to assert what else he was going to provide, and the answer is that there was nothing else he was going to provide. That's number one. I thought he initially told the police he didn't see the shooter. Wasn't that his very first statement? His first statement was that he didn't know who the shooter was. Correct. Okay. So his first statement was that he didn't know. It's not as if he went to the police immediately with information. Correct. But those are — but, you know, when the police first initially interviewed everyone, everyone at the scene said, oh, we didn't see who fired the shots. These were offhand statements. When he identified Frost as the shooter, again, he and his defense attorney contacted the detectives. They said, we want to provide information. They then went and met with the prosecutor. They were interviewed by a prosecutor. He identified McLaurin and Frost and identified Frost in the photo as the shooter. So I understand that that initial — that that statement to the police wasn't taken, let's say, at a deposition where he was under oath. But I would submit that the circumstances surrounding that statement were just as — If you apply Jeffries, which is supposed to be this really narrow doctrine that we've used for parties, to a non-party witness to say that if you say something to the police and then say later that it was a coerced statement, Jeffries would apply and you're, as a matter of law, not credible? I mean, that's kind of a — that would be quite a holding. Well, Your Honor, I think that in this case, the facts support that holding. Again, not only did he reach out, number one. Number two, he claimed he was coerced in the presence of a prosecutor and a defense attorney so that — which would lead to the conclusion that both the prosecutor and the defense attorney condoned and permitted a detective to falsely identify an innocent man in a murder, which is highly unlikely, if not completely improbable. Number two — Why not let a jury decide that? Because it's that fact connected with the fact that he reached out to provide information, which obviously was who the identity of the shooter was. And third, there's zero substantiation in this — That's why you might ultimately prevail. Well — But at this stage. Well, Your Honor, there's an additional fact set. There's zero substantiation in this case of any police misconduct. You know, in Jeffries, you had Jeffries' statement of police misconduct. Supported by other evidence, supported by the statement by his mother that he had reported to her about the police misconduct, supported by the statement of the mother of his children, as well as certain inferences to be drawn from documentary evidence. And in Jeffries, the district court disregarded his deposition testimony, which this Court affirmed. In this case, we're talking about a situation where there is zero evidence, not just a lack of hard or direct evidence substantiating his biggest claim of police misconduct, but there is zero evidence whatsoever corroborating that — Well, he does say that they pointed out Frost's picture in the — excuse me, in the array. Frost, what? His affidavit says that they pointed him to identify Frost, which is not the way to — the proper way to conduct an identification. Absolutely. But up until that 11th-hour declaration, there is zero evidence of misconduct in this case, which is what makes this case, I think, even weaker for appellant than the appellant's case in Jeffries. I mean, in this case, when they first interviewed Frost and Frost said, yeah, I was there, he indicated he had motive, he said he fled from the scene, they didn't arrest Frost. They let him go. They had no motive to pin this case on Frost. John McLaurin, the other person who identified Frost, made no indication of police misconduct. And Vega himself, aside from his declaration, there's no other indication that police, you know, misbehaved in this case. When Vega appeared before the jury at the criminal trial, while he refused to answer many of the questions, he didn't get up there and say, the police coerced me. So there's zero evidence substantiating that claim. Isn't there at least a triable issue as to whether Vega's identification influenced the decision to prosecute Frost? I mean, six months passed since the shooting. Frost is, you know, arrested within a week of Vega's interview. Well, I don't think so, Your Honor. I think the timeline of the facts was very important. I think that the police, excuse me, Vega reached out to the police because he wanted to provide information. Once he provided information, the police didn't run out and arrest Frost, and they could have. They knew who he was. They had already spoken to him. Instead, a few days later, the police then located John McLaurin, and John McLaurin identified Frost, and that statement I submit was the critical piece of evidence in this case. John McLaurin gave context and detail to the shooting that night. He said, I was with Frost. We were in a stairwell of a building. We were smoking marijuana. Frost saw some guys that had jumped him the night before. He fired into the crowd. We ran away. I saw him put a silver gun into his waistband. He then says, I asked Frost why he did it, and Frost told me that he did it because they had hospitalized his friend the night before. So it wasn't as if the police located Vega, got Vega's statement, and then went out and arrested Frost, and in that case, Vega's statement would have been the linchpin of the arrest and the prosecution. In this case, it was really McLaurin's statement that gave the police probable cause to move forward with the arrest, and it was only until his statement that night that the police ultimately arrested and advanced the prosecution. Let me ask you about the excessive force claims. I don't know if you know what I'm referring to in that video of July 16, 2013. That's the incident where they're in the yard, Your Honor. They're in the yard. Frost is on the ground. He's been restrained, and in a very pronounced way, an officer moves his knee to the plaintiff's head multiple times, and you hear the inmate shouting, stop kicking him in the head, and the camera moves away. So why wouldn't that be gratuitous excessive force? In fact, he was kneeing him in the head multiple times after he was on the ground. He's definitely restrained at that point. Judge, to be frank, I don't remember the exact circumstances of events, but, of course, I'll take you absolutely at your word. I would say that in that instance, from what I remember, the appellant was resisting arrest for a very long time. He was even on top of one of the officers for about 40 seconds. It doesn't matter how long he was resisting. If he's, in fact, restrained, obviously, you can't kick someone or knee someone in the head four times. But the issue regarding who the officer is an important issue, but his point is that if there's a malclaim where there's multiple instances, you wouldn't necessarily have to know who that particular officer was, right? Yes, Judge. I would argue there is no viable malclaim. The other incident, the so-called spitting or threatening to spit, because it's undisputed he didn't spit at the officer, right? Correct, Judge. He says that Captain Jemot took him to the ground, which I think the captain admitted to because he said he didn't want him to spit on him, slammed his face to the ground. The other officer knelt on him. They kicked him in the ribs and then dragged him on the ground in shackles. So if that's all true, why wouldn't that be excessive force for a threat to spit, which is what we have to assume that there was a threat, although I think he would argue that we can't even assume that because he said, I don't recall even threatening to spit. But even assuming we say there was a threat to spit, wouldn't that be excessive force? I don't think so, Your Honor. I think not only did he – not only do I not think there's a genuine dispute that he didn't – there's no genuine dispute that he threatened to spit, but it's also undisputed that he became combative, that he turned his body toward the officer, that he was – that's testimony provided by Captain Jemot that is not refuted. What do you mean not refuted? The plaintiff doesn't say that he resisted in any way. No, he became combative, and he turned his body toward the officer. And he says that he's being – That's what they say. And he says he was being pulled in shackles, and he was sort of not walking as fast as they wanted, and he wouldn't consider it resisting, but he was sort of dragging a little bit more. But in any event, I think that the officers would at least be entitled to qualified immunity. I don't think that they're required to let him spit, let him spit on them. I don't think they're required to let him – He said someone should spit. He said – He said I should spit in your effing face. I should spit. Why isn't that just a statement of disdain? I mean, what if he said someone should spit on you, or you deserve to be spit on? Would that be enough? Someone should spit on you. I think that's different. Saying I should spit in your effing face, I think, is a statement that suggests, you know, I'm going to spit in your – I'm going to spit in your face the next time you do something I don't like, or the moment I get a little more frustrated than I am now. I think that does constitute a legitimate threat. I think the officers don't have to stand there and wait for him to spit before they utilize force. And in this case, they took him to the ground. They restrained him. I think that even if they did end up dragging him to the next location, as he alleged, you know, a reasonable office could disagree on whether or not that constituted excessive force. This is a dangerous inmate who had a history of attacking other inmates and other staff. Only a few months before this, he was suspected of cutting an inmate's face when he was in Manhattan criminal court. And so I think at the very least, the officers were entitled to qualified immunity on each of the allegations of excessive force. Thank you. Thank you. Briefly, Your Honor, with respect to the issue of Mr. Vega contacting the detectives, even if we would assume he was there to identify the shooter, his previous statement had identified the person in the doorway. Not specifically he didn't say that person was the shooter yet, but he said the person in the doorway is the one in the white T-shirt, McLaurin. So for all we know, he was coming there and intending to identify McLaurin until Detective Spannicchia pointed to Mr. Frost's picture. That there's nothing inconsistent about him contacting the detectives and then being coerced or coached to provide information other than what he had intended to provide. As for the prosecutor and the defense attorney being there, I think that we can take notice that in the real world, at a proffer session, the prosecutor and the defense attorney and the witness's attorney are on the same side, that high-pressure tactics come-to-Jesus moments in proffer sessions are far from unheard of, and that while this presents a credibility issue for the city to argue to the jury, it is nothing like Jeffrey's, where Jeffrey's affidavit was not only contrary to 12, I believe, prior statements of his, including a plea colloquy, but it was also contrary to all the medical evidence. Whereas here, the circumstances before and after Mr. Vega's statement, starting, first of all, with the identification of the white T-shirt, McLaurin, in the door, and then later, when trial came, he did not, he refused to identify Mr. Frost, I think those corroborate that he really did not intend to identify Mr. Frost. It's an issue for the jury. What's the evidence that prior to Vega's statement, the police did not believe Frost was the shooter? I don't believe there's any such evidence. The police may very well have believed that Frost was the shooter but didn't feel they had enough to arrest him yet. And then once Vega came in, the case kicked into high gear, and within a week after that, they had brought in McLaurin, gotten a confirmatory identification, or, you know, what they believed to be confirmatory, and set in motion the criminal case. So, I would submit, again, there's an issue for a jury as to whether this is a causative factor for the due process claim. And finally, going to the excessive force, I think Judge Katzman correctly pointed out there's a difference between I should spit and I will spit, and I think that even counsel agreed that maybe that meant he might spit at some later time, rather than being an immediate threat to spit. And, in addition, I think that if you know, what Mr. Frost said was I don't recall saying that. Then he said maybe if I was mad, I did. I think it's for the jury to look at the surrounding circumstances and decide whether he was mad. And even if we were to assume that he did make that statement, I think, you know, a takedown not only a takedown, but slamming, kicking, dragging, and choking, and the only part that the defendants dispute is the choking, would constitute excessive force for a verbal threat where he's not even taking in his breath. He's not even physically preparing to spit. And he disputes being combative or resisting at that point. So I would submit that summary judgment in this case was in error and should be reversed. I'll rest on the briefs, Your Honor. Thank you both.